**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------- X

UNITED STATES OF AMERICA, *ex rel.* KARLA BELLOTTO and IVAN BELLOTTO, :

Plaintiffs, :

-against- :

MICHAEL SHABSELS, DAVID SHABSELS, RANDOLPH MITTASCH, SIMAD HOLDINGS LLC, DAMIS HOLDINGS LLC, KIWI OPERATINGCO LLC, WILLOW LAKE DAY CAMPS LLC, COUNTRY ROADS OPERATINGCO LLC, MOHAWKCAMPCO LLC, BANNER OPERATINGCO LLC, MEADOWBROOK OPERATINGCO LLC, and EAGLE'S LANDING DAY CAMP LLC, :

Defendants.

-------------------------------------- X

Docket No. ______________

**FALSE CLAIMS ACT COMPLAINT**

**FILED UNDER SEAL**

Plaintiff-Relators Karla and Ivan Bellotto (collectively, "Plaintiffs"), by their attorneys Kirby McInerney LLP, on behalf of themselves and the United States of America, as and for their Complaint against Defendants Michael Shabsels and David Shabsels (together, the "Shabsels"), Randolph Mittasch ("Mittasch"), Simad Holdings LLC ("Simad"), Damis Holdings LLC ("Damis"), Kiwi Operatingco LLC ("Kiwi Camp"), Willow Lake Day Camps LLC ("Willow Lake Camp"), Country Roads Operatingco LLC ("Country Roads Camp"), Mohawkcampco LLC ("Mohawk Camp"), Banner Operatingco LLC ("Banner Camp"), Meadowbrook Operatingco LLC ("Meadowbrook Camp"), and Eagle's Landing Day Camp LLC ("Eagle's Landing Camp") (collectively, the "Defendants"), allege as follows:

## SUMMARY OF ACTION

1. Plaintiffs bring this action on behalf of themselves and the United States of America under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.*, and seek damages on their behalf, as set forth herein.

2. This action seeks to recover damages arising from millions of dollars of Paycheck Protection Program ("PPP") loans to an affiliated set of day camp businesses that were falsely obtained and forgiven.

3. During the COVID-19 pandemic, the federal Government made PPP loans available to qualifying businesses under certain, specified conditions. The federal agency charged with administering the loans, the Small Business Administration ("SBA"), established eligibility criteria for the PPP loan program, including eligibility based on the number of employees that a business and its affiliates had. In the first of the two rounds of PPP loans, a business was generally not eligible for a loan if it and its affiliates had more than 500 employees. In the second round, a business was generally not eligible for a loan if it and its affiliates had more than 300 employees.

4. The PPP loans at issue here were obtained by Defendants Kiwi Camp, Willow Lake Camp, Country Roads Camp, Mohawk Camp, Banner Camp, Meadowbrook Camp, and Eagle's Landing Camp (together, the "Day Camp Defendants").

5. Each of the Day Camp Defendants, with the knowing and active participation of the Shabsels, Mittasch, and the Shabsels' holding companies Simad and Damis, made false applications for the PPP loans that concealed the Day Camp Defendants' affiliations with one another and with other businesses. They further caused other false records and statements to be made to get their PPP loans made and forgiven.

6. The loan applications and other records and statements were false because they asserted that one or more of the Day Camp Defendants was eligible for the PPP loans, when the

businesses were not eligible because they and their affiliates collectively had more than 500 or 300 employees.

7. Defendants knew that the loan applications and other records and statements were false because they knew both about their own affiliations and about the businesses' numbers of employees. Specifically, they knew that the Shabsels directly or indirectly owned more than 50% of the Day Camp Defendants and of a series of other businesses that operated sleepaway camps, and that those businesses employed well in excess of 500 persons.

8. If Defendants had honestly disclosed the true number of employees, the PPP loans would not have been given or forgiven.

9. The federal Government was damaged by Defendants' false claims for payment in the amount of the loans forgiven and the lender fees paid in connection with the loans.

10. Defendants' false and fraudulent conduct is being brought forward by plaintiff-relators Karla and Ivan Bellotto, who were in the day-camp business with the Shabsels. They have filed this suit on behalf of themselves and the federal Government to help the Government recover monies lost due to Defendants' conduct.

## JURISDICTION AND VENUE

11. This Court had jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and (b), and 28 U.S.C. §§ 1331 and 1345.

12. Venue is proper in this district under 28 U.S.C. §§ 1391(b) and 31 U.S.C. § 3732(a), as one or more of the defendants resides or transacts business in this jurisdiction and violations of the FCA described herein occurred in this district.

13. Relators' allegations are not substantially similar to publicly disclosed information, and Relators are original sources of the information provided herein.

14. Relators have voluntarily provided the Government with written disclosure of substantially all material evidence and information in their possession and with the information on which the allegations and transactions herein are based.

## THE PARTIES

15. Plaintiff Karla Bellotto is an individual residing in the State of New York. Karla Bellotto, together with her brother Ivan Bellotto, owns 37.5% of Kiwi Camp.

16. Plaintiff Ivan Bellotto is an individual residing in the State of New York. Ivan Bellotto, together with his sister Karla Bellotto, owns 37.5% of Kiwi Camp.

17. Defendant Michael Shabsels is an individual residing in the State of New York. Michael Shabsels, together with his brother David Shabsels, owns a majority interest in a series of day camps and sleepaway camps, including the Day Camp Defendants. Michael Shabsels, together with his brother David Shabsels, also owns and controls two camp holding companies, Defendants Simad and Damis.

18. Defendant David Shabsels is an individual residing in the State of New York. David Shabsels, together with his brother Michael Shabsels, owns a majority interest in a series of day camps and sleepaway camps, including the Day Camp Defendants. David Shabsels, together with his brother Michael Shabsels, also owns and controls two camp holding companies, Defendants Simad and Damis.

19. Defendant Randolph Mittasch ("Mittasch") is an individual residing in the State of New York. Mittasch is an associate of the Shabsels, and acts as their accountant and as the Chief Financial Officer of the camp-related businesses owned and operated by the Shabsels, including the Day Camp Defendants.

20. Defendant Simad Holdings LLC ("Simad"), is a limited liability company formed in 2012 under the laws of the State of New York. Simad is owned and controlled by the Shabsels. It is a member of several limited liability companies that own day camps and sleepaway camps, including the Day Camp Defendants.

21. Defendant Damis Holdings LLC ("Damis"), is a limited liability company formed in 2009 under the laws of the State of New York. Damis is owned and controlled by the Shabsels. It is a member of several limited liability companies that own day camps and sleepaway camps, including the Day Camp Defendants.

22. Kiwi Operatingco LLC ("Kiwi Camp"), is a limited liability company formed in 2013 under the laws of the State of New York. Kiwi Camp does business as Kiwi Country Day Camp and operates a day camp in Putnam County, New York.

23. In 2020 and 2021, the Shabsels, directly or indirectly, owned more than 50% of Kiwi Camp.

24. In 2020 and 2021, the Shabsels controlled and managed Kiwi Camp.

25. Willow Lake Day Camps LLC ("Willow Lake Camp"), is a limited liability company formed in 2012 under the laws of the State of New Jersey. Willow Lake Camp does business as Willow Lake Day Camp and operates a day camp located in Lake Hopatcong, New Jersey.

26. Upon information and belief, in 2020 and 2021, the Shabsels, directly or indirectly, owned more than 50% of Willow Lake Camp.

27. Upon information and belief, in 2020 and 2021, the Shabsels controlled and managed Willow Lake Camp.

28. Country Roads Operatingco LLC ("Country Roads Camp"), is a limited liability company formed in 2013 under the laws of the State of New Jersey. Country Roads Camp does business as Country Roads Day Camp and operates a day camp located in Manalapan, New Jersey.

29. Upon information and belief, in 2020 and 2021, the Shabsels, directly or indirectly, owned more than 50% of Country Roads Camp.

30. Upon information and belief, in 2020 and 2021, the Shabsels controlled and managed Country Roads Camp.

31. Mohawkcampco LLC ("Mohawk Camp"), is a limited liability company formed in 2009 under the laws of the State of New York. Mohawk Camp does business as Mohawk Day Camp and operates a day camp located in White Plains, New York.

32. Upon information and belief, in 2020 and 2021, the Shabsels, directly or indirectly, owned more than 50% of Mohawk Camp.

33. Upon information and belief, in 2020 and 2021, the Shabsels controlled and managed Mohawk Camp.

34. Banner Operatingco LLC ("Banner Camp"), is a limited liability company formed in 2013 under the laws of the State of Illinois. Banner Camp does business as Banner Day Camp and operates a day camp located in Lake Forest, Illinois.

35. Upon information and belief, in 2020 and 2021, the Shabsels, directly or indirectly, owned more than 50% of Banner Camp.

36. Upon information and belief, in 2020 and 2021, the Shabsels controlled and managed Banner Camp.

37. Meadowbrook Operatingco LLC ("Meadowbrook Camp"), is a limited liability company formed in 2016 under the laws of the State of New Jersey. Meadowbrook Camp does

business as Meadowbrook Country Day Camp and operates a day camp located in Long Valley, New Jersey.

38. Upon information and belief, in 2020 and 2021, the Shabsels, directly or indirectly, owned more than 50% of Meadowbrook Camp.

39. Upon information and belief, in 2020 and 2021, the Shabsels controlled and managed Meadowbrook Camp.

40. Eagle's Landing Day Camp LLC ("Eagle's Landing Camp"), is a limited liability company formed in 2011 under the laws of the State of New Jersey. Eagle's Landing Camp does business as Eagles Landing Day Camp and operates a day camp located in North Brunswick, New Jersey.

41. Upon information and belief, in 2020 and 2021, the Shabsels, directly or indirectly, owned more than 50% of Eagle's Landing Camp.

42. Upon information and belief, in 2020 and 2021, the Shabsels controlled and managed Eagle's Landing Camp.

43. The day camps operated by each of the Day Camp Defendants are, and were in 2020 and 2021, recreational day camps that offer a wide variety of activities for their campers.

44. Upon information and belief, the Shabsels, directly or indirectly, owned a controlling interest in at least nineteen additional summer camp businesses, including sleepaway camp businesses, during the period of March 2020 through March 2021.

## FACTUAL ALLEGATIONS

### A. THE PAYCHECK PROTECTION PROGRAM

45. On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") (Pub. L. 116-136) became law. Congress aimed to provide fast and direct

economic assistance to American workers, small businesses, and industries affected by the COVID-19 pandemic. Among other things, it authorized the SBA to guarantee loans under its primary loan program (the § 7(a) Loan Program) under a new program titled the "Paycheck Protection Program."

46. On April 24, 2020, the Paycheck Protection Program and Health Care Enhancement Act (Pub. L. 116-139) became law. It provided additional funding and authority for the PPP.

47. On June 5, 2020, the Paycheck Protection Flexibility Act of 2020 (Pub. L. 116-142) became law and modified certain provisions of the PPP, including provisions about forgiveness of the loans.

48. In December 2020, the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (Pub. L. 116-260) became law. It modified and extended the PPP.

49. The PPP disbursed loans in two rounds, a first draw in 2020, and a second draw in 2021.

50. The SBA delegated authority to third-party lenders to underwrite and approve the PPP loans. In order to obtain a PPP loan, a qualifying business was required to sign and submit a PPP loan application through the lender's application platform.

51. The third-party lenders processed the PPP loan applications and, upon approving a loan, used their own monies to fund the loans which were fully guaranteed by the SBA.

52. Lenders who processed and approved a borrower's PPP loan application submitted to the SBA the "Lender's Application – Paycheck Protection Program Loan Guaranty," by which they applied for a guarantee on the loan. On this form, the lenders repeated information provided by the borrower.

53. Lenders were compensated by the Government for their services by the payment of processing fees. The fees were based on the balance of the financing outstanding at the time of final disbursements in the following amounts: five (5) percent for loans of not more than $350,000; three (3) percent for loans of more than $350,000 and less than $2,000,000; or one (1) percent for loans of at least $2,000,000.

54. The CARES Act and subsequent legislation provided for forgiveness of first- and second-draw PPP loans. To receive forgiveness, borrowers were required to submit signed loan forgiveness applications.

55. The PPP loans were available only to small business concerns as defined by the SBA's size standards, which addressed the size of the applicant together with all of its affiliates.

56. For purposes of PPP loans, an applicant was considered an affiliate of another business if, among other things, a third party controlled or had the power to control both businesses. Control could be established through ownership, management, previous relationships, identity of interests, or contractual relationships. *See* 13 C.F.R. § 121.103(a)(6).

57. For a business to be eligible for a first-draw PPP loan, it and its affiliates must have had 500 or fewer employees or, if they had more than 500 employees, it must have met the SBA industry size standard.

58. On the application form for the first-draw PPP loans, the applicant was required to certify that it "employs no more than the greater of 500 or employees, or, if applicable, the size standard in number of employees established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry."

59. For a business to be eligible for a second-draw PPP loan, it and its affiliates must have 300 or fewer employees.

60. On the application form for the second-draw PPP loans, the applicant was required to fill out the following information on the form in effect in January and February and the first two days of March, 2021:

| | |
|---|---|
| **Number of Employees (including affiliates, if applicable; may not exceed 300):** | |

61. In addition, on the application form, the applicant was required to certify the following:

> The Applicant, together with its affiliates (if applicable), (1) is an independent contractor, self-employed individual, or sole proprietor with no employees; (2) employs no more than 300 employees; or (3) if NAICS 72, employs no more than 300 employees per physical location; (4) if a news organization that is majority owned or controlled by a NAICS code 511110 or 5151 business or a nonprofit public broadcasting entity with a trade or business under NAICS code 511110 or 5151, employs no more than 300 employees per location.

62. The application form for both the first- and second-draw PPP loans required that the applicant certify that, among other things, "the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects."

63. For the first-round PPP loans, a lender who processed a loan was required to report that the applicant had certified that it employed no more than the greater of 500 employees or meets the number of employees established by the SBA size standards.

64. For the second-round PPP loans, a lender who processed a loan was required to report that the applicant had certified that it satisfied the number of employees requirement.

## B. THE DAY CAMP DEFENDANTS APPLIED FOR AND RECEIVED PPP LOANS THAT WERE FORGIVEN

65. Each of the Day Camp Defendants applied for first- and second-draw PPP loans and applied for the forgiveness of those loans using application forms prepared by the SBA.

66. The Day Camp Defendants' applications for the PPP loans, and for the forgiveness of them, were prepared by Defendant Mittasch under the supervision and with the approval of the Shabsels.

67. Between about March and May 2020, each of the Day Camp Defendants submitted an application for a first-draw PPP loan.

68. The application of each Day Camp Defendant was prepared by or with the involvement of the Shabsels and Mittasch, each of whom was acting on behalf of the Day Camp Defendant.

69. On its application for a first-draw PPP loan, each Day Camp Defendant, acting through those individuals, represented that it employed no more than the greater of 500 employees or, if applicable, met the size standard in number of employees established by the SBA in 13 C.F.R. § 121.201 for its industry.

70. The representation included the number of employees of the Day Camp Defendant and its affiliates.

71. At the time of its application, each Day Camp Defendant had as its affiliates the other Day Camp Defendants.

72. At the time of its application, each Day Camp Defendant also had as its affiliates Simad and Damis.

73. At the time of its application, each Day Camp Defendant also had as its affiliates the several additional camp businesses, including sleepaway camp businesses, in which the Shabsels had, directly or indirectly, controlling interests.

74. The eligibility of each of the Day Camp Defendants was based on the number of persons employed by that business and its affiliated businesses. There was no applicable size standard in number of employees established by the SBA in 13 C.F.R. § 121.201 for its industry.

75. The industry of each Day Camp Defendant is the industry described by North American Industry Classification System ("NAICS") code 713990. The SBA regulations at 13 C.F.R. § 121.201 do not set a standard in number of employees for NAICS code 713990, so no such standard is applicable to the Day Camp Defendants.

76. On its application for a first-draw PPP loan, each Day Camp Defendant represented that it had fewer than 500 employees.

77. On its application for a first-draw PPP loan, each Day Camp Defendant listed each of the persons or entities that owned more than 20% of it.

78. On its application for a first-draw PPP loan, each Day Camp Defendant responded "no" to the question "Is the Applicant or any owner of the Applicant an owner of any other business, or have common management with, any other business? If yes, list all such businesses and describe the relationship on a separate sheet identified as addendum A." None of the Day Camp Defendants provided a separate sheet identifying any such businesses.

79. The application for a first-draw PPP loan made by each of the Day Camp Defendants was signed by an authorized representative for that Day Camp Defendant.

80. The authorized representative of each Day Camp Defendant certified on the Day Camp Defendant's first-draw PPP loan application that he had read the statements included in the application form and understood them.

81. The authorized representative of each Day Camp Defendant had read the statements included in the loan application form and had understood them.

82. The authorized representative of each Day Camp Defendant certified on the Day Camp Defendant's first-draw PPP loan application that the Day Camp Defendant was eligible to receive a loan under the rules in effect at the time the application was submitted that had been issued by the SBA in implementing the PPP.

83. Before making that certification, the authorized representative had reviewed or was aware of the rules concerning eligibility to receive a PPP loan in effect at the time the application was submitted that had been issued by the SBA in implementing the PPP.

84. The authorized representative of each Day Camp Defendant certified on the Day Camp Defendants' first-draw PPP loan application that the information provided in the application and the information provided in all supporting documents and forms was true and accurate in all material respects.

85. For each of these first-draw PPP loans, the lender submitted information about the loan to the SBA, including information conveying that the Day Camp Defendant had certified that it had fewer than 500 employees.

86. Each of the Day Camp Defendants submitted to its lender an application for forgiveness of its first-draw PPP loan.

87. Each Day Camp Defendant, on its application for forgiveness of its first-draw PPP loan represented that it had fewer than 500 employees.

88. The representation included the number of employees of the Day Camp Defendant and its affiliates.

89. Each Day Camp Defendant, on its application for forgiveness of its first-draw PPP loan did not check the box included with the text "If Borrower (together with affiliates, if applicable) received PPP loans in excess of $2 million, check here: ☐."

90. The first-draw PPP loan forgiveness applications for each of the Day Camp Defendants was signed by an authorized representative for the Day Camp Defendant.

91. The authorized representative of each Day Camp Defendant certified on the Day Camp Defendants' first-draw PPP loan forgiveness application that the information provided in the application and the information provided in all supporting documents and forms was true and accurate in all material respects.

92. The first-draw PPP loans made to each of the Day Camp Defendants, together with interest on them, were forgiven.

93. None of the Day Camp Defendants repaid their first-draw PPP loans.

94. The table below summarizes the information about each of the Day Camp Defendants' first-draw PPP loans:

| Business Name | Date Approved | Lender | Loan Amount | Amount Forgiven |
|---|---|---|---|---|
| Kiwi Operatingco LLC | 5/26/2020 | Northeast Bank | $ 539,800.00 | $ 544,340.00 |
| Willow Lake Day Camps LLC | 5/1/2020 | Bank of America | $ 579,234.00 | $ 584,487.00 |
| Country Roads Operatingco LLC | 4/12/2020 | TD Bank | $ 810,313.00 | $ 819,159.00 |
| Mohawkcampco LLC | 5/1/2020 | Bank of America | $ 1,549,636.00 | $ 1,566,703.00 |
| Banner Operatingco LLC | 4/27/2020 | Byline Bank | $ 986,991.00 | $ 996,806.00 |
| Meadowbrook Operatingco LLC | 5/18/2020 | Northeast Bank | $ 986,000.00 | $ 994,266.00 |
| Eagle's Landing Day Camp LLC | 5/12/2020 | Northeast Bank | $ 422,700.00 | $ 426,510.00 |

95. Between about January and March 2021, each of the Day Camp Defendants submitted applications for second-draw PPP loans.

96. Each of these applications was prepared by or with the involvement of the Shabsels and Mittasch, each of whom was acting on behalf of the Day Camp Defendants.

97. On its application for a second-draw PPP loan, each Day Camp Defendant represented that it employed no more than 300 employees.

98. The representation included the number of employees of the Day Camp Defendant and its affiliates.

99. At the time of its second-draw application, each Day Camp Defendant had as its affiliates the other Day Camp Defendants.

100. At the time of its second-draw application, each Day Camp Defendant also had as its affiliates Simad and Damis.

101. At the time of its second-draw application, each Day Camp Defendant also had as its affiliates the several additional camp businesses, including sleepaway camp businesses, in which the Shabsels had, directly or indirectly, controlling interests.

102. On its application for a second-draw PPP loan, each Day Camp Defendant certified to the lender that it had fewer than 300 employees.

103. On its application for a second-draw PPP loan, each Day Camp Defendant listed each of the persons or entities that owned more than 20% of it.

104. On its application for a second-draw PPP loan, each Day Camp Defendant responded "no" to the question "Is the Applicant or any owner of the Applicant an owner of any other business, or have common management (including a management agreement) with any other business? If yes, list all such businesses (including their TINs if available) and describe the relationship on a separate sheet identified as addendum A." None of the Day Camp Defendants provided a separate sheet identifying any such businesses.

105. The second-draw PPP loan applications for each of the Day Camp Defendants was signed by an authorized representative for the Day Camp Defendant.

106. The authorized representative of each Day Camp Defendant certified on the Day Camp Defendant's second-draw PPP loan application that he had read the statements included in the application form and understood them.

107. The authorized representative of each Day Camp Defendant had read the statements included in the loan application form and had understood them.

108. The authorized representative of each Day Camp Defendant certified on the Day Camp Defendants' second-draw PPP loan application that the Day Camp Defendant was eligible to receive a loan under the rules in effect at the time the application was submitted that had been issued by the SBA in implementing the PPP.

109. Before making that certification, the authorized representative had reviewed or was aware of the rules concerning eligibility to receive a PPP loan in effect at the time the application was submitted that had been issued by the SBA in implementing the PPP.

110. The authorized representative of each Day Camp Defendant certified on the Day Camp Defendants' second-draw PPP loan application that the information provided in the application and the information provided in all supporting documents and forms was true and accurate in all material respects.

111. For each Day Camp Defendant's second-draw PPP loans, the lender submitted information about the loan to the SBA, including information conveying that the Day Camp Defendant had certified that it had fewer than 300 employees.

112. Each of the Day Camp Defendants submitted to its lender an application for forgiveness of its second-draw PPP loan.

113. Each Day Camp Defendant, on its application for forgiveness of its second-draw PPP loan represented that it had fewer than 300 employees.

114. The representation included the number of employees of the Day Camp Defendant and its affiliates.

115. Each Day Camp Defendant, on its application for forgiveness of its second-draw PPP loan did not check the box included with the text "If Borrower (Together with Affiliates, if Applicable) Received First Draw PPP Loans of $2 Million or More or Second Draw PPP Loans of $2 Million or More, check here: ☐."

116. The second-draw PPP loan forgiveness applications for each of the Day Camp Defendants was signed by an authorized representative for the Day Camp Defendant.

117. The authorized representative of each Day Camp Defendant certified on the Day Camp Defendants' second-draw PPP loan forgiveness application that the information provided in the application and the information provided in all supporting documents and forms was true and accurate in all material respects.

118. The second-draw PPP loans made to each of the Day Camp Defendants, together with interest on them, were forgiven.

119. None of the Day Camp Defendants repaid their second-draw PPP loans.

120. The table below summarizes the information about each of the Day Camp Defendants' second-draw PPP loans:

| Business Name | Date Approved | Lender | Loan Amount | Amount Forgiven |
|---|---|---|---|---|
| Kiwi Operatingco LLC | 3/1/2021 | MVB Bank, Inc. | $ 768,410.00 | $ 775,070.00 |
| Willow Lake Day Camps LLC | 2/27/2021 | Bank of America | $ 810,929.00 | $ 817,283.00 |
| Country Roads Operatingco LLC | 2/6/2021 | Community Fed. Sav. Bank | $ 1,134,438.00 | $ 1,142,473.00 |
| Mohawkcampco LLC | 1/28/2021 | Easthampton Savings Bank | $ 2,000,000.00 | $ 2,024,164.00 |
| Banner Operatingco LLC | 2/6/2021 | Wayne Bank | $ 1,394,904.00 | $ 1,405,831.00 |
| Meadowbrook Operatingco LLC | 2/6/2021 | Wayne Bank | $ 1,380,766.00 | $ 1,391,582.00 |
| Eagle's Landing Day Camp LLC | 2/3/2021 | M&T Bank | $ 591,804.00 | $ 596,295.00 |

## C. DEFENDANTS MADE CLAIMS THAT WERE FALSE

121. By seeking and receiving the first- and second-draw PPP loans for the Day Camp Defendants, and by seeking and receiving their forgiveness, Defendants presented, or caused to be presented, false claims for payment. They further made and used, or caused to be made or used, false records or statements that were material to the false claims.

122. The Day Camp Defendants presented claims for payment by submitting loan application forms and loan forgiveness forms and making representations and certifications about, among other things, the number of persons employed by each of them and their affiliates.

123. The Day Camp Defendants' representations and certifications about the numbers of persons employed were made in each Day Camp Defendant's loan applications for the first- and second-draw PPP loans, in each application for forgiveness of the loans, and in each lender form made in connection with the loans.

124. These representations and certifications made in connection with the first-draw PPP loans were false because each Day Camp Defendant, together with its affiliates, employed more than 500 persons at the time.

125. In their applications for the first-draw loans, the Day Camp Defendants represented the following numbers of employees:

| Business Name | Number of Employees |
|---|---|
| Kiwi Operatingco LLC | 77 |
| Willow Lake Day Camps LLC | 61 |
| Country Roads Operatingco LLC | 90 |
| Mohawkcampco LLC | 151 |
| Banner Operatingco LLC | 70 |
| Meadowbrook Operatingco LLC | 88 |
| Eagle's Landing Day Camp LLC | 36 |
| | **573** |

126. The representation by each of the Day Camp Defendants was of the number of employees it had at the time, without including the employees of any affiliates.

127. At the time of each Day Camp Defendant's application for a first-draw PPP loan, the Day Camp Defendants collectively had 573 employees, which is more than 500 employees.

128. At the same time, other affiliates of each Day Camp Defendant had even more employees such that the total number of employees of the affiliated entities combined was well in excess of 573.

129. Each Day Camp Defendant's application for a first-draw PPP loan was also false because on each application the Day Camp Defendant answered "no" to the question that asked "Is the Applicant or any owner of the Applicant an owner of any other business, or have common management with any other business?"

130. That response was false because each Day Camp Defendant had owners that owned other businesses, and, further, each Day Camp Defendant had common management with other businesses, including the other Day Camp Defendants and other businesses owned and controlled, directly or indirectly, by the Shabsels.

131. Each Day Camp Defendant's application for a first-Draw PPP loan was also false because it contained a certification by the Day Camp Defendant's authorized representative that the Day Camp Defendant was eligible to receive a loan under the rules in effect at the time the application was submitted that had been issued by the Small Business Administration implementing the PPP. In fact it was not eligible under those rules.

132. Each Day Camp Defendant's application for a first-Draw PPP loan was also false because it contained a certification by the Day Camp Defendant's authorized representative that the information provided in the application and the information provided in all supporting

documents and forms was true and accurate in all material respects, when it was not true and accurate. Rather, it misrepresented the number of employees, the common ownership, and the eligibility of the Day Camp Defendant for a PPP loan.

133. These representations and certifications made in connection with the second-draw PPP loans were false because each Day Camp Defendant, together with its affiliates, employed more than 300 persons at the time.

134. In their applications for the second-draw loans, the Day Camp Defendants represented the following numbers of employees:

| Business Name | Number of Employees |
|---|---|
| Kiwi Operatingco LLC | 52 |
| Willow Lake Day Camps LLC | 61 |
| Country Roads Operatingco LLC | 70 |
| Mohawkcampco LLC | 109 |
| Banner Operatingco LLC | 61 |
| Meadowbrook Operatingco LLC | 88 |
| Eagle's Landing Day Camp LLC | 36 |
| | **477** |

135. The representation by each of the Day Camp Defendants was of the number of employees it had at the time, without including the employees of any affiliates.

136. At the time of each Day Camp Defendant's application for a second-draw PPP loan, the Day Camp Defendants collectively had 477 employees, which is more than 300 employees.

137. At the same time, other affiliates of each Day Camp Defendant had even more employees such that the total number of employees of the affiliated entities combined was well in excess of 477.

138. With respect to the second-draw PPP loans, the application of each Day Camp Defendant was also false because it listed an inaccurate NAICS code.

139. Upon information and belief, each Day Camp Defendant represented on its second-draw PPP application form that its applicable NAICS code was 721214.

140. NAICS code 721214 describes the industry for sleepaway camps, because they include overnight accommodations. The code is not applicable to day camps like the Day Camp Defendants.

141. Defendants misrepresented the Day Camp Defendants' NAICS codes on the applications because PPP borrowers with 500 or fewer employees in industries with NAICS codes beginning with the digits "72" did not need to apply the SBA's affiliation rules. The Day Camp Defendants were not in an industry with an NAICS code beginning with the digits "72," so the affiliation rules applied to them and the Day Camp Defendants' eligibility for PPP loans was based on, among other things, whether each one, together with its affiliates, had more than 500 employees (for first-draw PPP loans) or 300 employees (for second-draw PPP loans).

142. Each Day Camp Defendants' application for a second-draw PPP loan was also false because on each application the Day Camp Defendant answered "no" to the question that asked "Is the Applicant or any owner of the Applicant an owner of any other business, or have common management (including a management agreement) with any other business?"

143. That response was false because each Day Camp Defendant had owners that owned other businesses, and, further, each Day Camp Defendant had common management with other businesses, including the other Day Camp Defendants and other businesses owned and controlled, directly or indirectly, by the Shabsels.

144. Each Day Camp Defendant's application for a second-Draw PPP loan was also false because it contained a certification by the Day Camp Defendant's authorized representative that the Day Camp Defendant was eligible to receive a loan under the rules in effect at the time

the application was submitted that had been issued by the Small Business Administration implementing the PPP. In fact it was not eligible.

145. Each Day Camp Defendant's application for a second-Draw PPP loan was also false because it contained a certification by the Day Camp Defendant's authorized representative that the information provided in the application and the information provided in all supporting documents and forms was true and accurate in all material respects, when it was not true and accurate. Rather, it misrepresented the number of employees, the common ownership and the eligibility of the Day Camp Defendant for a PPP loan.

146. The Day Camp Defendants' applications for forgiveness of the first- and second-draw PPP loans were also false.

147. On its loan forgiveness application, each Day Camp Defendant falsely indicated that it, together with its affiliates, had not received PPP loans of more than $2 million. In fact, each Day Camp Defendant together with its affiliates had received PPP loans of more than $2 million.

148. On its loan forgiveness application, each Day Camp Defendant's authorized representative falsely certified that the information in the form was true and accurate, when the information was not true and accurate because it misrepresented the amount of PPP loans to each Day Camp Defendant together with its affiliates.

149. Upon information and belief, the Defendants made and used other false records or statements that were material to the Day Camp Defendants' false claims for payment.

## D. DEFENDANTS' FALSITY WAS MATERIAL

150. Defendants' misrepresentations of the Day Camp Defendants' numbers of employees, including the numbers of employees of their affiliates, were material to the extension and forgiving of the first- and second-draw PPP loans made to the Day Camp Defendants.

151. If Defendants had disclosed when they applied for the first-draw PPP loans that the Day Camp Defendants, together with their affiliates, had more than 500 employees, the loans would not have been extended.

152. If Defendants had disclosed when they applied for forgiveness of the first-draw PPP loans that the Day Camp Defendants, together with their affiliates, had more than 500 employees, the loans would not have been forgiven.

153. If Defendants had disclosed when they applied for the second-draw PPP loans that the Day Camp Defendants, together with their affiliates, had more than 300 employees, the loans would not have been extended.

154. If Defendants had disclosed when they applied for forgiveness of the second-draw PPP loans that the Day Camp Defendants, together with their affiliates, had more than 300 employees, the loans would not have been forgiven.

155. The Government has repeatedly demonstrated that it views as material to it false statements about eligibility for PPP loans based on the numbers of employees and affiliates' employees. It has pursued and is pursuing numerous enforcement actions against persons who received PPP loans based on such false representations. Examples of such enforcement include several *qui tam* cases concerning misrepresentations of the number of employees of affiliates. *See, e.g.*, DOJ Press Release, "Victory Automotive Group Inc. Agrees to Pay $9 Million to Settle False Claims Act Allegations Relating to Paycheck Protection Program Loan," October 11, 2023, available at https://www.justice.gov/opa/pr/victory-automotive-group-inc-agrees-pay-9-million-settle-false-claims-act-allegations (last visited Aug. 19, 2024); DOJ Press Release, "National Roofing Company Settles PPP Fraud Allegations for $9 Million," Dec. 11, 2023, available at https://www.justice.gov/usao-ndtx/pr/national-roofing-company-settles-ppp-fraud-allegations-9-

million (last visited Aug. 19, 2024); DOJ Press Release, "Southern California Dental Offices and Former Owners Pay $6.3M to Resolve False Claims Act Allegations Relating to Improper Paycheck Protection Program Loans," Aug. 8, 2024, available at https://www.justice.gov/opa/pr/southern-california-dental-offices-and-former-owners-pay-63m-resolve-false-claims-act (last visited Aug.. 19, 2024). Another example of similar enforcement is a non-*qui tam* settlement of such issues. *See* DOJ Press Release, " San Mateo Company To Pay More Than $1,000,000 For Improperly Seeking And Obtaining Paycheck Protection Program Loans," June 9, 2023, available at https://www.justice.gov/usao-ndca/pr/san-mateo-company-pay-more-1000000-improperly-seeking-and-obtaining-paycheck (last visited Aug. 21, 2024).

## E. DEFENDANTS ACTED KNOWINGLY

156. Defendants had actual knowledge that their representations and certifications about the number of employees of the Day Camp Defendants and their affiliates were false. At a minimum, they acted with reckless disregard of the truth of the matter or in deliberate ignorance of the truth of the matter.

157. Each of the Day Camp Defendants maintained records showing the number of employees it had at the time it applied for the first- and second-draw PPP loans and at the time it applied for forgiveness of those loans.

158. Each of the Day Camp Defendants used those records to, among other things, complete their applications for the PPP loans and for the forgiveness of those loans.

159. The Shabsels, Mittasch, Simad, and Damis each had access to and has reviewed records maintained about the number of employees of each of the Day Camp Defendants for purposes of conducting the business of the Day Camp Defendants. They and their associates reviewed and used such records, for example, to prepare employment tax withholding reports, for

unemployment insurance purposes, and for other reasons. They and their associates also used those records to prepare the Day Camp Defendants' applications for PPP loans and for forgiveness of those loans.

160. Defendants further had access to or maintained records that showed the ownership of each of the Day Camp Defendants. They knew from such records that the Shabsels, directly or indirectly, held controlling ownership interests in each of the Day Camp Defendants.

161. Defendants also had access to or maintained records that showed that the Shabsels, directly or indirectly, held controlling ownership interests in numerous other summer camp businesses, including several sleepaway camp businesses.

162. In preparing their applications for the PPP loans, Defendants reviewed the applications carefully.

163. They saw that applications for the PPP loans requested that the applicants indicate whether the applicant together with its affiliates employed more than 300 or 500 persons.

164. Upon information and belief, in order to provide information on the applications, Defendants reviewed for each of the Day Camp Defendants which other businesses were affiliated with it due to common ownership or for other reasons, and how many employees each affiliate had.

165. Upon information and belief, the Defendants saw from such review that each Day Camp Defendant together with its affiliates employed more than 500 persons, at the time of applying for its first-draw PPP loan, or 300 persons, at the time of applying for its second-draw PPP loan. Nevertheless, Defendants falsely represented that each Day Camp Defendant, together with its affiliates, had fewer employees than it actually had because they knew that if they answered honestly, the loans would not be extended or forgiven.

## F. DEFENDANTS CONSPIRED TO VIOLATE THE FALSE CLAIMS ACT

166. Defendants conspired to present, or cause to be presented false claims for payment, and further conspired to make and use, or cause to be made or used, false records or statements to get false claims paid.

167. Defendants acted collectively pursuant to an agreement among them to misrepresent the number of employees that each of the Day Camp Defendants, together with their affiliates, had at the time each Day Camp Defendant applied for its PPP loans or the forgiveness of them. The purpose of such agreement was to make the businesses appear to be eligible for PPP loans, and their forgiveness, when the businesses were not eligible because they were too large to qualify.

## G. THE GOVERNMENT HAS BEEN DAMAGED

168. As a result of Defendants' conduct described herein, the federal Government has been damaged. It guaranteed and then forgave PPP loans, with interest, for which the Defendant Day Camps were ineligible. The Government also paid lender processing fees that were based on the amounts loaned. It would not have paid those fees if the loans were not extended.

169. The amount of damages suffered by the Government will be determined at trial, but is believed to exceed $13.6 million, which is to be trebled under the False Claims Act. In addition, Defendants are liable for penalties for each violation of the False Claims Act.

## COUNT I

### Violation of the False Claims Act, 31 U.S.C. §3729(a)(1)(A)

170. Plaintiffs re-allege and incorporate by reference the allegations in the paragraphs above as though fully set forth herein.

171. Through the acts described above, Defendants knowingly presented or caused to be presented materially false or fraudulent claims for payment to the Government.

172. By Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT II

### Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

173. Plaintiffs re-allege and incorporate the allegations in the paragraphs above as though fully set forth herein.

174. Through the acts described above, Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

175. By Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT III

### Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C)

176. Plaintiffs re-allege and incorporate the allegations in the above paragraphs as though fully set forth herein.

177. Through the acts described above, Defendants conspired to violate the False Claims Act by agreeing to knowingly present or cause to be presented materially false or fraudulent claims for payment or the Government and by knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims.

178. By Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relators respectfully request judgment be entered in favor of them and the United States as follows:

1. Finding direct violations of the False Claims Act:

2. Finding a conspiracy to violate the False Claims Act;

3. Directing that Defendants pay treble damages to the federal Government and the maximum civil penalties for each violation of the False Claims Act;

4. Awarding Plaintiff-Relators the maximum amount pursuant to 31 U.S.C. §3730(d);

5. Directing that Defendants pay Plaintiff-Relators' reasonable expenses, attorneys' fees, and costs they or their counsel incurred in this action;

6. Awarding Plaintiff-Relators all costs of this action; and

7. Awarding Plaintiff-Relators and the United States such other and further relief as this Court deems just and equitable.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relators hereby demand a trial by jury on all issues so triable.

Dated: New York, New York
August 28, 2024

Respectfully submitted,

KIRBY MCINERNEY LLP

By: ______________________

Randall M. Fox
David E. Kovel
Rohan M. Kulkarni
250 Park Avenue, Suite 820
New York, New York 10177
(212) 371-6600
rfox@kmllp.com
dkovel@kmllp.com
rkulkarni@kmllp.com

*Counsel for Plaintiff-Relators*